# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BREANNE MAGGIO, on behalf of herself and all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>THE PROCTER & GAMBLE COMPANY, One Procter & Gamble Plaza, Cincinnati, OH 45201, and RAINFOREST ALLIANCE, INC., 125 Broad Street, New York, NY 10004,<br><br>        Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><u>DEMAND FOR JURY TRIAL</u> |

## PREAMBLE

Plaintiff Breanne Maggio ("Plaintiff"), individually and on behalf of herself and other similarly situated individuals, by and through her counsel, hereby files this Class Action Complaint for equitable relief and damages against Defendants The Procter & Gamble Company ("P&G") and Rainforest Alliance, Inc. ("RA") concerning their false and deceptive marketing representations of Charmin toilet paper ("Charmin") and Puffs tissue ("Puffs") products (collectively, "the Products") as "sustainable" and helping to "protect, grow, and restore trees." The sourcing and production of Charmin and Puffs contributes to environmentally destructive and unsustainable forest degradation, including clearcutting of the climate-critical and biodiverse Canadian Boreal Forest. Reasonable consumers seeking to buy sustainable and responsibly sourced paper products are misled both by P&G's advertising and marketing of Charmin and Puffs products as unqualifiedly "sustainable" and RA's independent representations that the products are RA-certified, when they are not. RA's "Forest Allies" seal depicted on the Products also misleads consumers into believing that the Products are RA-certified and/or beneficial to forest

ecosystems, when the opposite is true. Plaintiff alleges the following based upon personal knowledge, information, belief, and the investigation of Counsel:

## INTRODUCTION

1. Plaintiff brings this class action lawsuit on behalf of herself and similarly situated consumers ("Class Members") who purchased Defendant P&G's RA-certified Charmin toilet paper and Puffs tissues, which are advertised as environmentally friendly despite unsustainable supply chain practices. The Products are formulated, designed, manufactured, advertised, distributed, and sold by P&G or its agents to consumers, including Plaintiff, across the United States.

2. Defendant P&G was founded over 180 years ago and is now "the world's largest consumer goods company."[1]

3. According to U.S. Census data and the Simmons National Consumer Survey, 86.27 million Americans used Charmin Ultra in 2020 alone.[2]

4. P&G manufactures and sells the Products, both in store and through online retailers.

5. The Hoberg Paper Company founded Charmin in 1928. The company changed its name to Charmin Paper Company in 1950, and P&G acquired it in 1957.

6. After purchasing Charmin in 1957, P&G replaced Charmin Facial Tissues with the creation of Puffs tissues in 1960.

---

[1] *About Us*, P&G, https://www.pgcareers.com/about-us (last visited Mar. 13, 2025).
[2] *See U.S. population: which brands of toilet paper do you use most often?*, Statista (Feb. 5, 2024), https://www.statista.com/statistics/275967/us-households-most-used-brands-of-toilet-paper/.

7.      On the packaging of Charmin, Defendant P&G represents that the Products are sourced in accordance with the "Charmin Sustainability Promise" that promotes three pillars or actions: "protect, grow, and restore," as seen in the image below.[3]



8.      P&G also makes expansive sustainability representations on its webpages for Charmin, described in further detail below, including that Charmin products help to "protect, grow, restore" trees.[4]

---

[3]      *Charmin Ultra Soft Super Mega Roll 2-Ply Toilet Paper*, Giant Food, https://giantfood.com/product/charmin-ultra-soft-super-mega-roll-2-ply-toilet-paper-6-ct-pkg/228640 (last visited Mar. 31, 2025).

[4]      *See Sustainability,* Charmin, https://www.charmin.com/en-us/sustainability (last visited Mar. 13, 2025).

9. P&G, however, sources Charmin and Puffs from mills that engage in environmentally destructive and unsustainable logging practices that lead to extensive forest degradation, including clearcutting of the climate-critical and biodiverse Canadian Boreal Forest.[5]

10. Each year, industrial logging operations clearcut approximately one million acres of intact forest in the Canadian boreal, equivalent to five National Hockey League rink–size areas every minute.[6]

11. Industrial logging companies are the main culprits for this clearcutting and do so to meet demand for wood products—of which the United States is Canada's largest purchaser.[7] Much of this logging goes to make toilet paper, paper towels, and facial tissues that consumers use once and then throw away.[8]

12. This rapid clearcutting of forests has many negative environmental consequences, including the destruction of wildlife habitats, which threatens imperiled species like caribou and many migratory songbirds that rely on intact forests for breeding.[9]

---

[5] *See* Dominick A. DellaSala, et al., *Measuring forest degradation via ecological-integrity indicators at multiple spatial scales,* 302 *Biological Conservation* 110939 (2025), https://doi.org/10.1016/j.biocon.2024.110939; *see also You've Heard Charmin's Spin, Now Here Are the Facts,* NRDC (Aug. 2020) https://www.nrdc.org/sites/default/files/pg-charmin-boreal-truths-fs.pdf. (noting that, according to conversations with P&G representatives and market research, Charmin suppliers include Aditya Birla's AV Terrace Bay mill, Domtar's Dryden mill, and Resolute Forest Products' Thunder Bay mill. Based on the most recent available Forest Management Unit (FMU) annual reports, these mills receive pulp from the following FMUs: Black Spruce Forest, English River Forest, Lac Seul Forest, Lake Nipigon Forest, Kenogami Forest, Red Lake Forest, Trout Lake Forest, and Whiskey Jack Forest).

[6] *See Canada's Boreal Forest: Why It's So Important,* NRDC (Jul. 1, 2022), https://www.nrdc.org/stories/canadas-boreal-forest-why-its-important; *see also* Dominick A. DellaSala et al., Red-*Listed Ecosystem Status of Interior Wetbelt and Inland Temperate Rainforest of British Columbia, Canada,* 10 *Land* 775 (2021), https://doi.org/10.3390/land10080775; Brendan Mackey et al, *Assessing the Cumulative Impacts of Forest Management on Forest Age Structure Development and Woodland Caribou Habitat in Boreal Landscapes: A Case Study from Two Canadian Provinces,* 13 *Land* 6 (2024), https://doi.org/10.3390/land13010006.

[7] *United States Wood Imports by country in US$ Thousand 2022*, World Integrated Trade Solution, https://wits.worldbank.org/CountryProfile/en/Country/USA/Year/LTST/TradeFlow/Import/Partner/by-country/Product/44-49_Wood (last visited Mar. 31, 2025).

[8] *Id.*

[9] *See You've Heard Charmin's Spin, Now Here Are the Facts, supra* note 5; *see also Caribou (Boreal population)*, Ontario Ministry of the Environment, Conservation and Parks, https://www.ontario.ca/page/caribou-boreal-population (last visited Mar. 31, 2025); *Amended Recovery Strategy for the Woodland Caribou (Rangifer*

13.     Sourcing from the Canadian Boreal Forest also exacerbates climate change by transferring carbon stored in forests and soils to the atmosphere.[10]

14.     Manufacturing paper products from virgin forest fiber creates three times the carbon emissions as toilet paper made with 100% recycled content.[11] It also causes air pollution as the production of pulp from virgin fiber generates twice as many hazardous air pollutants and 40% more sulfur dioxide as recycled tissue.[12]

15.     This conduct leads to forest degradation, which occurs when forest ecosystems lose their capacity to provide important services to people and nature.

16.     The logging activities that go into producing P&G products are a form of degradation that affect boreal forests at local (forest stands) and landscape (wide stretches) scales.[13]

17.     Defendant RA is an international non-governmental organization ("NGO") incorporated in New York with offices throughout the United States, and which, among other things, certifies consumer products for their sustainability.

---

*tarandus caribou), Boreal population, in Canada [Proposed] 2019*, Environment and Climate Change Canada (Nov. 27, 2020) https://www.canada.ca/en/environment-climate-change/services/species-risk-public-registry/recovery-strategies/woodland-caribou-boreal-2019.html; Steve Lundeberg, *Bird populations in eastern Canada declining due to forest 'degradation,' research shows,* Oregon State University (Apr. 28, 2022), https://news.oregonstate.edu/news/bird-populations-eastern-canada-declining-due-forest-'degradation'-research-shows.

[10] *See Logging Emerges as Canada's Third Largest Climate Polluter*, Nature Canada (Sept. 4, 2024), https://naturecanada.ca/news/press-releases/logging-emerges-as-canadas-third-largest-climate-polluter/; *see also* Jay R. Malcolm, Bjart Holtsmark & Paul W. Piascik, *Forest Harvesting and the Carbon Debt in Boreal East-Central Canada*, 161 *Climatic Change* 433 (2020), https://doi.org/10.1007/s10584-020-02711-8.

[11] Shelley Vinyard and Jennifer Skene, *Unrolling Charmin's Sustainability Claims,* NRDC (Mar. 12, 2019), https://www.nrdc.org/bio/shelley-vinyard/unrolling-charmins-sustainability-claims.

[12] *Id.*

[13] DellaSala, et al., *supra* note 5.

18.     RA represents to consumers that its certification "represent[s] our strict sustainability requirements," which include "protect[ing] and improv[ing] "[f]orests," "[c]limate," "[h]uman [r]ights," and "[l]ivelihoods."[14]



19.     RA receives payment from companies that wish to have their products certified.[15]

---

[14] *What Does "Rainforest Alliance Certified" Mean?*, Rainforest Alliance (Nov. 13, 2024), https://www.rainforest-alliance.org/insights/what-does-rainforest-alliance-certified-mean/.

[15] *Rainforest Alliance License Agreement General Terms and Conditions*, Rainforest Alliance (Dec. 20, 2024) at 2, https://www.rainforest-alliance.org/resource-item/rainforest-alliance-license-agreement-general-terms-and-conditions/ (RA's license agreement states "Royalties. RA charges Royalties to licensees based on traded volumes of Certified Products. The rate charged varies by crop as set forth in the Royalty Schedule and is charged once to a specific party in the Certified Supply Chain. ORGANIZATION agrees to inform RA of any change in volume that affects the amount of the Royalty to be paid.").

20.     RA purports that the products it certifies are "audited against sustainability standards based on the triple bottom line: environmental, economic, and social well-being,"[16] for a "more resilient and inclusive future."[17]

21.     The RA website represents that Charmin Products are RA certified. This is false.

22.     Further, major retailers selling P&G products continue to advertise Charmin as "Rainforest Alliance certified."[18]

23.     Separately, both products display the RA Forest Allies logo on their packaging, which appears nearly identical to the RA certification seal. *See infra* ¶ 28.

24.     RA's online representation of the products as certified, along with the use of the Forest Allies logo on package, lead reasonable consumers to believe that the Products are RA certified, when they are not.

25.     In fact, the "Forest Allies" program does not certify nor perform any audits and has no connection with the Products or their sourcing whatsoever.

26.     Instead, the Forest Allies program is "a community of practice focusing on protecting, restoring, and enabling responsible management of tropical forests."[19] P&G is one of two founding members of the Forest Allies program, which merely requires members to pay annual

---

[16] *2020 Certification Program*, Rainforest Alliance, https://www.rainforest-alliance.org/for-business/2020-certification-program/ (last visited Mar. 31, 2025).

[17] *Advances for People and Nature in Our Certification Program*, Rainforest Alliance (Aug. 10, 2020), https://www.rainforest-alliance.org/insights/advances-for-people-and-nature-in-our-certification-program/.

[18] *P&G's Family Care Brands Share New Sustainability Goals Focused on Forestry*, P&G (Oct. 4, 2019), https://us.pg.com/blogs/new-sustainability-goals-forestry/ (noting that "Charmin [is] also Forest Stewardship Council® (FSC®), and Rainforest Alliance certified. For every tree we use, at least one is regrown. We will go even further to increase acres of certified forests, strengthen certification globally, and accelerate research into alternative fiber approaches.")

[19] *Forest Allies*, Rainforest Alliance, https://www.rainforest-alliance.org/business/forest-allies/ (last visited Mar. 13, 2025).

dues. The program materials do not specify how the funds are used, other than stating that the membership fees go towards "projects or locations around the world in need of resources."[20]

27.     The Forest Allies program ***does not*** certify products and ***does not*** perform any audits of product supply chains.

28.     By utilizing the Forest Allies logo (which looks nearly identical to the RA seal but for the words beneath the frog) and through its representations that the Products are RA certified, RA misleads consumers into believing that the Products are RA certified. Below are images of the RA certification seal (left) and the Forest Allies logo (right).

 

29.     Defendant P&G's representations that the Products are "sustainable" and help to "protect, grow, and restore" trees mislead consumers into believing that the Products are ***not*** made using environmentally damaging processes, when in fact, the Products ***are*** the result of forest degradation practices, including clearcutting of primary forests.

30.     Further, Defendant P&G's representations that the Products are RA certified, when they are not, are false and misleading to consumers.

---

[20] *Forest Allies: Join Our Community of Practice*, Rainforest Alliance (Oct. 2020), https://www.rainforest-alliance.org/wp-content/uploads/2020/11/Forest-allies-twopager-final.pdf.

31. Defendant P&G's use of the Forest Allies logo, which is nearly identical in appearance to the RA certification seal, is misleading to consumers.

32. Similarly, Defendant RA's representations on its consumer-facing website that Charmin Products are RA certified are false and misleading to consumers.

33. Defendant RA's involvement in creating the Forest Allies program and logo and continuing to allow P&G to use the Forest Allies logo on Charmin Products further misleads consumers into believing that Charmin is an RA certified product, when it is not.

34. Thus, Defendants' marketing is false and misleading to consumers.

35. Accordingly, Plaintiff brings her claims against Defendants individually and on behalf of a class of all others similarly situated for (1) violations of the New York General Business Law § 349; (2) violations of the New York General Business Law § 350, (3) violations of all other state consumer protection statutes, (4) breaches of express warranty, (5) breaches of implied warranty, and (6) unjust enrichment.

## **PARTIES**

36. Plaintiff Maggio is an individual consumer who is currently a citizen of Valley Stream, New York.

37. During the Class Period, Plaintiff Maggio purchased the Products approximately every month in multi-pack quantities at BJ's locations at 125 Green Acres Rd S, Valley Stream, New York 11581, 711 Stewart Ave, Garden City, New York 11530, and 50 Daniel St. Farmingdale, New York 11735, and also at Costco locations at 625 Broadhollow Road, Melville, New York 11747 and 3705 Hampton Road, Oceanside, New York 11572.

38. Plaintiff, when she purchased the Products, saw and believed that the Products were environmentally friendly and sustainable, based on Defendants' representations. The sustainability

representations of the Products were material to Plaintiff and encouraged her to make her purchases. Plaintiff Maggio relied upon these representations, which as a consumer she had no reason to doubt.

39.     Plaintiff Maggio, along with other consumers, relies on representations when deciding which products to purchase.

40.     Plaintiff Maggio, along with other consumers, is willing to pay more for products that have benefits supposedly unique to that product.

41.     Plaintiff Maggio, along with other consumers, is injured when she pays a price premium based on false or misleading representations.

42.     Plaintiff Maggio would not have purchased the Products or would not have purchased them on the same terms, if she had known that contrary to Defendants' representations, the Products are derived from unsustainable forest degradation practices.

43.     On March 28, 2025, Plaintiff Maggio sent each Defendant a pre-suit notice letter of all the claims and allegations in this Complaint.

44.     Defendant P&G is incorporated and headquartered in Ohio.

45.     Defendant markets and sells the Product in stores and online throughout the United States, including in New York.

46.     Through its misrepresentations, P&G has caused harm to Plaintiff and Class Members.

47.     Defendant RA is incorporated and headquartered in New York.

48.     RA has played a pivotal role in disseminating the misrepresentations throughout United States, including in New York.

# FACT ALLEGATIONS

## I. Defendant P&G Represents That the Products Are Environmentally Friendly.

### A. *P&G Products Generally*

49.     Defendant P&G manufactures and sells the Products both in stores and through online retailers to consumers nationwide.

50.     P&G represents that it sources its wood pulp from a globally recognized certification system. P&G's investor website claims:

> P&G requires 100% of the wood pulp we source to be certified by a globally recognized certification system…which include criteria related to protecting both environmental and social values of forests. By producing all of our products with 100% certified pulp, we are helping to promote forestry practices that leave a smaller environmental footprint, protect vulnerable species, and make a positive impact on communities that depend on them.[21]

51.     P&G maintains a "Wood Pulp Grievance Tracker," claiming:

> P&G sources wood pulp that is used in the production of products in Family Care, Baby Care, and Feminine Care business units such as paper towels, diapers, feminine hygiene products, and toilet paper. P&G will ensure the forests harvested for our pulp are managed sustainably and responsibly. Our direct suppliers and their sub-suppliers comply with P&G's Wood Pulp Sourcing Policy.[22]

52.     P&G's wood grievance tracker indicates that the Wood Pulp Sourcing Policy has "criteria related to the following topics: no illegal logging, conversion, deforestation, or degradation, protection of high conservation value areas, respect for human and labor rights, free, prior, and informed consent for Indigenous Peoples, and minimum forest certification."[23]

53.     The foregoing statements by P&G mislead consumers because most would expect P&G's Wood Pulp Sourcing Policy to *prohibit* "illegal logging, conversion, deforestation, or

---

[21] *Environmental - Pulp,* P&G, https://www.pginvestor.com/esg/environmental/forestry/pulp/default.aspx (last visited Mar. 31, 2025).

[22] *Wood Pulp Grievance Tracker,* P&G (Aug. 2024), https://s1.q4cdn.com/695946674/files/doc_downloads/esg/WoodPulpGrievanceTracker.pdf.

[23] *Id.*

degradation," prohibit activities that undermine or are inconsistent with the stated objective of "protecti[ng] [] high conservation value areas, respect[ing] [] human and labor rights," and prohibit activities that undermine or are inconsistent with the stated objective of receiving "free, prior, and informed consent for Indigenous Peoples, and minimum forest certification." Instead, P&G's sourcing policy does not explicitly prohibit the practices mentioned.[24]

54. P&G also represents that the Products are Forest Stewardship Council ("FSC") certified,[25] which further represents to consumers that P&G's sourcing practices do not harm forest environments.

55. Upon information and belief, P&G's sourcing practices involve illegal logging, conversion, deforestation, degradation, destruction of high conservation value areas, and destruction of native land without informed consent of Indigenous Peoples.

56. P&G's website, Mapping Our Impact, states:

> Forests are critical to supporting life on earth and protecting them is essential to the people and wildlife that call them home. We are committed to zero deforestation in our supply chain. For example, we require our wood pulp in products be third-party certified - **for every tree we use at least one is regrown**…We are helping protect and restore nature through partnerships and projects around the world and are committed to a regenerative approach. **We are planting more than a million trees through partnerships to protect and restore forests that touch 35 countries and are committed to the long-term health of natural ecosystems that are essential to people, wildlife and the planet.**[26]

57. P&G's supply chain for the Products has been credibly linked with forest degradation practices—namely, by sourcing extensively from forest units that contain boreal

---

[24] DellaSala, et al*., supra* note 5.

[25] *See Environmental - Pulp supra* note 21 (FSC is a "FSC is a non-profit organization, providing trusted solutions to help safeguard the world's forests and tackle today's deforestation, climate, and biodiversity challenges."); *see also The future of forests is in our hands,* FSC, https://fsc.org/en (last visited Feb. 28, 2025) (note that the FSC certification itself has come under scrutiny by environmental advocates); *Destruction: Certified*, Greenpeace Int'l (2021), https://www.greenpeace.org/static/planet4-international-stateless/2021/04/b1e486be-greenpeace-international-report-destruction-certified_finaloptimised.pdf.

[26] *See Mapping Our Impact*, P&G, https://us.pg.com/mapping-our-impact/ (last visited Mar. 31, 2025) (emphasis in original); *see also* DellaSala, et al., *supra* note 5.

caribou habitat and lack FSC certification. Reasonable consumers would consider these practices—turning carbon-rich, native mature and old-growth forests into clearcuts and young tree plantations—not only forest degradation but also tantamount to "deforestation," based on the colloquial meaning of deforestation.

58.     Defendant RA is complicit in, and profits off, these misrepresentations.

**B. *Charmin***

59.     Charmin products are available online and at various locations throughout New York, including Target, Walgreens, CVS, and Walmart, as evidenced by the screenshot below.[27]



60.     On the packaging of the Products, P&G represents that the Products are sourced in accordance with the "Charmin Sustainability Promise" that promotes three pillars or actions: "protect", "grow", and "restore." These words are depicted encircling the image of a tree and

---

[27] *See generally Where to Buy Charmin*, Charmin, https://www.charmin.com/en-us/shop-products/ultra-strong-toilet-paper (last visited Mar. 13, 2025).

clearly indicating to consumers that these principles are related to P&G's forest sourcing practices. The image below reflects these pillars and was taken from the Charmin website on January 21, 2025.



61.     This insignia is also present on Charmin packaging, as seen in the below image:



62.     P&G also claims to "plant" or "regrow" two trees for every one used.  These claims exist not only on P&G's own website, but also on the website for third party retailers Sam's Club and Amazon.

63.     The Sam's Club website states:

"At Charmin, we are committed to making our toilet paper work hard to make a sustainable difference. 100% of our paper comes from responsibly managed forests. For every tree used, at least two are regrown in its place. P&G and Charmin are partnering with the Arbor Day Foundation to plant 1 million trees in forests affected by natural disasters, like wildfires or hurricanes." [28]

64.     As shown in the screenshot below, on Amazon's website, the Products are marketed as being sourced from "responsibly managed forests."[29]

---

[28] *Charmin Ultra Strong 2-Ply Toilet Paper 32 rolls, 231 sheets/roll*, Sam's Club, https://www.samsclub.com/p/charmin-ultra-strong-2-ply-toilet-paper-231-sheets-roll-32rolls/P990350415?xid=plp_product_5&bvstate=pg:35/ct:r (last visited Mar. 31, 2025).

[29] *Charmin Toilet Paper Ultra Soft Cushiony Touch, 30 Family Mega Rolls = 153 Regular Rolls*, Amazon, https://www.amazon.com/dp/B09YLN9GX7 (last visited Mar. 31, 2025).

**Charmin Beyond The Roll**



**FSTM Certified**

We only use pulp certified by the Forest Stewardship Council and support FSC in their work to increase adoption of FSC products. These standards ensure that we are protecting wildlife and contributing to thriving local communities.

**Protect, Grow and Restore.**

At Charmin, we are committed to making our toilet paper work hard to make a sustainable difference. 100% of our paper comes from responsibly managed forests.



**Forest Restoration**

P&G and Charmin are partnering with the Arbor Day Foundation to plant 1 million trees in forests affected by natural disasters, like wildfires or hurricanes.

65.    Upon information and belief, P&G provides this information to third-party retailers.

**C.  *Puffs***

66.    Consumers can purchase Puffs tissues at both Walmart and Amazon and "other select retailers."[30]

---

[30] *See Puffs Ultra Soft Buy Now,* PUFFS, https://puffs.com/en-us/shop-products/non-lotion-tissue/puffs-ultra-soft (last visited Feb. 24, 2025).



67. Puffs products similarly repeat P&G's promise to replant one tree for every used, as seen in the images below.[31]

---

[31] *See Puffs Ultra Soft Facial Tissues, 1 Family Size Box, 124 Facial Tissues Per Box,* CVS, https://www.cvs.com/shop/puffs-ultra-soft-facial-tissues-1-family-size-box-124-facial-tissues-per-box-prodid-405614 (last visited Feb. 24, 2025).



68. Puffs also represents that its Ultra Soft product utilizes "raw ingredients sourced from sustainably managed forests."[32]

69. Puffs represents that its paper products are "made of a pulp blend that includes sustainably sourced, fast-growing renewable fibers." Further, Puffs claims that "100% of our

---

[32] *See Facial Tissue Facts and FAQs*, Puffs, https://puffs.com/en-us/about-puffs/frequently-asked-questions (last visited Mar. 31, 2025).

[Puffs'] virgin fibers come from sources that have been 3rd party certified to ensure they adhere to responsible sourcing principles and criteria."[33]

70. Additionally, like Charmin, Puffs purports to abide by its own Sustainability Promise to "protect, grow, and restore" trees, as seen in the screenshot below.



---

[33] *Id.*

71.    This language is also present on Puffs packaging, as seen in the below image:



72.    Defendant P&G's representations that the Products are environmentally friendly mislead consumers into believing that the Products are *not* made using environmentally damaging processes, when in fact, the Products *are* the result of forest degradation practices. Thus, Defendant P&G's marketing is false and misleading to consumers.

## II.     Defendant P&G's Products Are Not Environmentally Friendly.

73.    Contrary to Defendant P&G's representations, the Products are not environmentally friendly nor sustainable because their production causes forest degradation, yields inordinately high carbon emissions, threatens imperiled wildlife like woodland caribou and migratory songbirds, and generates hazardous air pollutants.[34]

74.    P&G's own disclosures in its July 2022 Forestry Practices Update indicate that it sources from suppliers whose managed land overlaps with intact forest landscapes ("IFLs"), as well as critical boreal caribou habitat.[35] IFLs are stretches of primary forest with a minimum area of 500km squared. Primary forests are any forests that have never been industrially disturbed and have developed following natural disturbances and under natural processes.[36] Primary forests, inclusive of IFL's, are recognized as being irreplaceable in terms of biodiversity, carbon storage, and provision of ecosystem services.[37]

75.    Industrial logging in primary forests, whether in IFLs, boreal caribou habitat (a good proxy for primary forests),[38] or other primary forest areas, is a form of forest degradation.

---

[34] *See* Sarah Ruiz, *What you should know about protecting the United States' old forests,* Woodwell Climate Research Ctr. (June 1, 2023), https://www.woodwellclimate.org/protect-us-mature-and-old-growth-forests/; *see also* Ronnie Drever, *Primer on Forest Carbon,* Nature United, https://www.natureunited.ca/what-we-do/our-priorities/innovating-for-climate-change/forest-carbon-boreal-forest/ (last visited Mar. 13, 2025); Beverly Law & William Moomaw, *Old forests are critically important for slowing climate change and merit immediate protection from logging,* The Conversation (Jan. 19, 2024), https://theconversation.com/old-forests-are-critically-important-for-slowing-climate-change-and-merit-immediate-protection-from-logging-220771; Ian Austen and Vjosa Isai, *Canada's Logging Industry Devours Forests Crucial to Fighting Climate Change*, The New York Times (Jan. 4, 2024), https://www.nytimes.com/2024/01/04/world/canada/canada-boreal-forest-logging.html; Dana Kobilinsky, *Forest Degradation in Canada Causes Bird Decline*, The Wildlife Society (May 3, 2022), https://wildlife.org/forest-degradation-in-canada-causes-bird-decline/.

[35]    *Forestry Practices Update July 2022*, P&G (July 2022) at 2, https://s1.q4cdn.com/695946674/files/doc_downloads/2022/07/Forestry-Practices-Update-July-2022.pdf.

[36]    *Forest Biodiversity Definitions*, Convention on Biological Diversity, https://www.cbd.int/forest/definitions.shtml, (last visited Mar. 13, 2025).

[37]    Julia E. Fa et al., *Importance of Indigenous Peoples' Lands for the Conservation of Intact Forest Landscape*s, 18 *Frontiers in Ecol. & Env't* 135 (2020), https://doi.org/10.1002/fee.2148.

[38]    *See* Cheryl A. Johnson et al., *Protecting Boreal Caribou Habitat Can Help Conserve Biodiversity and Safeguard Large Quantities of Soil Carbon in Canada*, 12 *Sci. Rep.* 17067 (2022), https://doi.org/10.1038/s41598-022-21476-x.; *see also* Cheryl A. Johnson et al., *Science to Inform Policy: Linking Population Dynamics to Habitat*

76.   P&G has not prohibited sourcing from IFLs.[39]

77.   In the supplement to its 2021 *Forestry Practices Report,* P&G states that it will continue sourcing wood pulp from IFLs for its products.[40]

78.   A 2020 article from the Natural Resources Defense Council ("NRDC") reported that the mills supplying Charmin source from forest management units which overlap with declining boreal caribou ranges.[41]

79.   P&G's own disclosures indicate that, in Canadian forests, from which P&G sourced 34% of its wood pulp from in 2021,[42]  P&G's suppliers' managed land overlaps with boreal caribou habitat.[43]

80.   According to Canada's Boreal Caribou Recovery Strategy, this level of disturbance gives the impacted herds less than a 60% chance of long-term survival.[44]

81.   Boreal caribou habitat is a good proxy for primary forests, as boreal caribou rely on undisturbed primary forest for their survival.[45]

82.   Sourcing from the Canadian Boreal Forest also exacerbates climate change through the release of carbon to the atmosphere otherwise stored in soils and foliage. Manufacturing

---

*for a Threatened Species in Canada,* 57 *J. Appl. Ecol.* 2172 (2020), https://doi.org/10.1111/1365-2664.13637; Justina Ray, *Saving our caribou forces us to face tough questions,* The Narwhal (May 16, 2019), https://thenarwhal.ca/saving-our-caribou-forces-us-to-face-tough-questions/.

[39]   *See      Forestry     Practices     Report     Supplement*,     P&G     (June     7,     2021), https://s1.q4cdn.com/695946674/files/doc_downloads/esg/2021/8958_P-G_Forestry_Practices_Report_A-4.pdf; *see also Forestry Practices Update July 2022*, *supra* note 35.

[40]   *Id.*

[41]   *See* Brendan Mackey, et al, *supra* note 6.

[42]   Data     and     Metrics:     P&G     Global     Corporate     -     Wood     Pulp,     P&G, https://www.pginvestor.com/esg/environmental/forestry/pulp/default.aspx#pulp_data (last visited Mar. 31, 2025).

[43]   *Forestry Practices Update July 2022*, *supra* note 35.

[44]   *Amended Recovery Strategy for the Woodland Caribou (Rangifer tarandus caribou), Boreal population, in   Canada   [Proposed]   2019*,   Species   at   Risk   Act   Recovery   Strategy   Series   (2019), https://www.canada.ca/en/environment-climate-change/services/species-risk-public-registry/recovery-strategies/woodland-caribou-boreal-2019.html.

[45]   *See* Cheryl A. Johnson, et al. and Justina Ray, *supra* note 38.

paper products from virgin forest fiber creates three times the carbon emissions as toilet paper made with 100% recycled content.[46]

83. As more than 100 scientists wrote to the signatories of the Glasgow Leaders' Declaration on Forests and Land Use:[47]

> "Whether examining degradation through the lens of carbon storage, native species habitat, ecological complexity, water filtration and other services, or even future timber value, the industrial logging, particularly clearcutting,[48] of primary forests indelibly and significantly depletes or mars the forest's original characteristics, no matter the subsequent forest regeneration practices…As a clear and egregious example of forest degradation, the commercial logging of primary forests is incompatible with achieving the preservation of a safe climate and stable biodiversity."

84. Thus, there is consensus in the scientific forestry community that the practice of commercial logging of primary forests—which P&G's own materials admit to engaging in—runs contrary to combatting climate change and protecting biodiversity.

85. Further, P&G sources wood pulp from Dryden Mill. Dryden Mill has historically dumped mercury generated from bleaching paper into the English-Wabigoon River System, causing widespread and multi-generational health problems for Grassy Narrows' residents.

86. Below is an image of clearcut sections in boreal forest near Dryden in Northwestern Ontario, Canada published by the NRDC:[49]

---

[46] *See* Shelley Vinyard and Jennifer Skene, *supra* note 11.

[47] *Letter from Scientists to the Signatories of the Glasgow Leaders' Declaration on Forests and Land Use*, NRDC (Nov. 16, 2022), https://www.nrdc.org/sites/default/files/media-uploads/scientists_letter_to_glasgow_declaration_signatories_nov_2022_final.pdf.

[48] More than 90% of industrial logging in Canada is through clearcutting. *See Forest Area Harvested on Private and Crown Lands,* National Forestry Database, http://nfdp.ccfm.org/en/data/harvest.php, (last visited Mar. 13, 2025).

[49] Shelley Vinyard, *The Tragedy of Toilet Paper and Why Charmin Must Change*, NRDC (Oct. 8, 2019), https://www.nrdc.org/bio/shelley-vinyard/tragedy-toilet-paper-and-why-charmin-must-change.



87.    Below is another clearcut area of boreal forest in Northwestern Ontario, Canada published by the NRDC:[50]

---

[50] Ashley Jordan, *Sustainable TP is on a Roll, But Charmin Stays Rough on Forests*, NRDC (Sept. 16, 2024), https://www.nrdc.org/bio/ashley-jordan/sustainable-tp-roll-charmin-stays-rough-forests.



88.     Each of these images was taken near mills from which P&G sources the Products.

89.     A 2021 NRDC report found that P&G continues to source from pulp producers that source from forest units with threatened species habitat without the stronger protections that FSC requires.[51]

90.     Upon information and belief, these mills are engaging in clearcutting forest degradation activities of critical wildlife habitats.

91.     P&G is, therefore, sourcing the Products from mills relying on forest degradation practices that are clearly not sustainable.[52]

---

[51] Courtenay Lewis & Ashley Jordan, *By a Thousand Cuts: How Powerful Companies' Wood Sourcing is Degrading Canada's Boreal Forest,* NRDC (Apr. 2021), https://www.nrdc.org/sites/default/files/thousand-cuts-wood-sourcing-canadas-boreal-report.pdf.
[52] DellaSala, et al.*, supra* note 5.

### III.    Defendant RA Represents That Products Bearing Its Seal Are Sustainable.

92.    Defendant RA represents that its certification "is a symbol of environmental, social, and economic sustainability."[53]

93.    RA advertises that it is "creating a more sustainable world by using social and market forces to protect nature and improve the lives of farmers and forest communities."[54]

94.    The RA website represents that "the green frog seal is awarded to farms and forests that meet rigorous environmental and social standards." The green frog is featured in the image below.[55]



95.    Importantly, this is *not* the same seal currently featured on the Products. Instead, the Products currently feature the below, nearly identical, Forest Allies logo.

---

[53] *Find the Frog*, Rainforest Alliance, https://www.rainforest-alliance.org/find-certified/ (last visited Mar. 13, 2025).

[54] *Our Vision,* Rainforest Alliance, https://www.rainforest-alliance.org/about/ (last visited Mar. 13, 2025).

[55] *See Find the Frog*, *supra* note 53.



96.     The only difference between the RA certification seal and the Forest Allies logo are the words beneath the frog. Where the certification seal has "people & nature" written beneath the frog, the Forest Allies logo has "forest allies" written beneath the frog.

97.     RA notes that "the Rainforest Alliance certification seal can be used by farms and companies that meet the rigorous criteria of the Sustainable Agriculture Standard, part of the Rainforest Alliance certification program. It can be found on thousands of consumer products across the globe."[56]

98.     As of January 24, 2025, the RA website states that, in order to be listed on the RA website, businesses must meet the following requirements: (1) the business offers consumer-facing products that bear the RA certified seal and that are available for direct purchase; (2) the business is in compliance with its Use of Seal Guidelines; (3) the RA seal is featured directly on the product or packaging; and (4) if the product is sold online only and does not have packaging where the RA certified seal can be displayed, then the seal must appear on the webpage where the product is featured, next to the product's description.[57]

---

[56] *See Using Our Logo and Seal,* Rainforest Alliance (Dec. 11, 2024), https://www.rainforest-alliance.org/business/marketing-sustainability/using-our-logo-and-seal/.
[57] *See How to Get Supply Chain Certification: A Guide for Companies,* Rainforest Alliance (Sept. 24, 2024), https://www.rainforest-alliance.org/business/certification/how-to-get-supply-chain-certification-a-guide-for-companies/.

99.     Sometime prior to November 2017, P&G's Puffs tissue products were certified by Rainforest Alliance.[58]

100.    Sometime prior to March 2017, P&G's Charmin toilet paper products were certified by Rainforest Alliance.[59]

101.    In 2018, however, the RA's Certification Unit ("RA-Cert") was acquired by Preferred by Nature and the RA ***no longer directly certifies businesses*** against forestry and tourism standards.[60]

102.    As of September 30, 2023, the license agreements terminated, meaning businesses are not able to use the Rainforest Alliance Certified seal on the certified products or related promotional materials.[61]

103.    Major retailers selling P&G products continue to display the RA Certified seal and make associated claims, misleading consumers and in direct violation of the RA policy.

104.    The below screenshot was taken from the Amazon product page for the sale of Charmin Ultra Soft, indicating that the Product is RA certified and including the RA certification seal. [62]

---

[58] *Puffs,* RA https://www.rainforest-alliance.org/find-certified/puffs/ (last visited Feb. 24, 2025).

[59] *Charmin*, Rainforest Alliance (Mar. 9, 2017), https://www.rainforest-alliance.org/find-certified/charmin/.

[60] Kataryzyna Nagrodzka, *Rainforest Alliance Certified seal phase-out for old RA-Cert clients*, Preferred by Nature (Nov. 17, 2021), https://www.preferredbynature.org/news/rainforest-alliance-certifiedtm-seal-phase-out-old-ra-cert-clients.

[61] *Id.*

[62] *Charmin Ultra Soft Cushiony Touch Toilet Paper, 24 Family Mega Rolls = 123 Regular Rolls*, Amazon, https://www.amazon.com/dp/B0798DVT68 (last visited Mar. 13, 2025).

 **Sustainability features**

This product has sustainability features recognized by trusted certifications.

**Forestry practices** ⌃

Made with materials harvested from responsibly managed forests.

As certified by

 Rainforest Alliance

🌳 The Forest Stewardship Council

**Biodiversity** ⌃

Made with materials harvested in a way that helps protect animals, plants, and a healthy ecosystem.

As certified by

 Rainforest Alliance

105.    The Forest Allies logo appears on the packaging of Puffs products as seen in the images below:[63]

---

[63] *See Puffs Ultra Soft Facial Tissues, 1 Family Size Box, 124 Facial Tissues Per Box,* CVS, https://www.cvs.com/shop/puffs-ultra-soft-facial-tissues-1-family-size-box-124-facial-tissues-per-box-prodid-405614 (last visited Mar. 31, 2025).

# Puffs Ultra Soft Facial Tissues, 1 Family Size Box, 124 Facial Tissues Per Box

★★★★☆ 3.9 (1615 reviews)











106.    The Amazon page for Puffs also indicates in the product information that the Product is Rainforest Alliance certified as seen below:[64]

Rainforest Alliance certified. Made in the USA from domestic and imported materials.

107.    The Giant page for Puffs also indicates in the product information that the Product is Rainforest Alliance certified as seen below:[65]

---

[64] *See Puffs, Ultra Soft Non-Lotion Facial Tissues 8 Mega Cubes 72 Facial Tissues per Cube, 8 Count*, AMAZON.COM, https://www.amazon.com/dp/B0CD21B43K (Last visited Mar. 31, 2025).

[65] *See Puffs Plus Lotion 2-Ply Facial Tissue Flat Box,* Giant Food, https://giantfood.com/groceries/laundry-paper-cleaning/paper-products/facial-tissues/puffs-plus-lotion-2-ply-facial-tissue-flat-box-124-ct-box.html (last visited Mar. 31, 2025).

## DETAILS

21.3 cm x 20.8 cm (8.4 in x 8.2 in). Gentle & soothing. A nose in need deserves Puffs indeed. FSC: Mix - Paper, supporting responsible forestry. Rainforest Alliance certified. Find out more at ra.org.

108.    The RA website also represents that both products are RA certified.

109.    Consumers can visit RA's "Find the Frog" website[66] to research whether certain products are RA certified. Charmin and Puffs are both listed on the RA website as certified, as displayed in the screenshots below:



---



110.    The same website prompts the consumer to learn more about what the RA certification process entails ("what does it take to be listed here?") and states that businesses must meet certain requirements to obtain certification.

111.    The same website takes consumers to the company website, as seen in the screenshots below, where a consumer can purchase the Products, all while under the impression that the Products are RA certified.[67]

---

[67] *Id.*





## IV. Defendant P&G's Products Are Not Certified by Defendant RA.

112.   RA explicitly represents to consumers that the Products are RA certified, when they are not.  Compounding this consumer confusion is RA's creation of the Forest Allies "community of practice" and corresponding logo that is almost identical to the RA certification seal as seen *supra* ¶¶ 94 and 95.

113. P&G is a "founding member" of the Forest Allies Community of Practice and helped to "develop and launch" the program.[68]

114. As a founding member of the Forest Allies program, P&G was allowed to use an "altered but nearly identical seal" for three years at a cost of $250,000 per year.[69]

115. As of 2021, P&G represents that it has partnered with RA "by investing in developing and launching the Forest Allies Community of Practice,"[70] highlighting its direct involvement with P&G's misrepresentations. *See supra* § II.

116. The RA website describes Forest Allies as "a community of practice focused on protecting, restoring, and enabling responsible management of tropical forests."[71]

117. Notably, the Forest Allies program is described as a community focused on "tropical" forests, despite being plastered on Products that source from the Canadian **Boreal** Forest. This further misleads consumers about the truth of the Products' supply chain.

118. Further, the Forest Allies program *does not* certify products. Instead, the program "aims to create long-lasting impact through people and partnerships," without enumerating any definitive actions that the organization takes beyond "annual membership dues" and "participation in bi-annual workshops."[72]

119. Participation in the Forest Allies program does not involve any auditing of the company or product's supply chain for sustainable sourcing or practices.

---

[68] *Environmental*, P&G, https://www.pginvestor.com/esg/environmental/forestry/partnerships/default.aspx (last visited Mar. 13, 2025).
[69] Milana Nikolova, *P&G accused of "greenwashing" and "misleading" consumers with on-pack sustainability claims,* Packaging Insights (Jan. 22, 2025), https://www.packaginginsights.com/news/pg-accused-of-greenwashing-and-misleading-consumers-with-on-pack-sustainability-claims.html.
[70] *Forest Allies: Join Our Community of Practice*, *supra* note 20.
[71] *Id.*
[72] *Id.*

120.    As such, consumers are affirmatively deceived by RA's representations on its consumer-facing website that the Products are RA-certified. Consumers are further misled at the point of sale by both P&G and RA due to the presence of the "Forest Allies" logo on the Products' packaging, which looks strikingly similar to the RA certification seal and also leads consumers to believe that the Products are RA certified when they are not. *See supra* ¶¶ 94, 95.

**V.       Defendants' Representations Are Material to Consumers.**

121.    Consumers care about whether the products they purchase are sustainably sourced.

122.    According to a study entitled "*Consumers care about sustainability and back it up with their wallets,*" 60% of U.S. consumers disclosed that they care about buying environmentally and ethically sustainable products.[73] The study also found that "a wide range of consumers across incomes, life stages, ages, races, and geographies are buying products bearing ESG-related labels."[74]

123.    A recent study found that 78% of US consumers say that a sustainable lifestyle is important to them.[75]

124.    Also, "68% [of Americans] would pay more for sustainable products."[76]

125.    In a 2024 survey by PricewaterhouseCoopers, more than 80% of consumers said they are willing to pay more for sustainably produced or sourced goods.[77]

---

[73] *See Consumers care about sustainability–and back it up with their wallets*, NIQ (Feb. 6, 2023), https://nielseniq.com/global/en/insights/report/2023/consumers-care-about-sustainability-and-back-it-up-with-their-wallets/.

[74] *Id*. Also, note that "ESG" stands for Environmental, Social, and Governance.

[75] *Id* at 2.

[76] *Interest in Sustainability Surges for Consumer Products*, Computer Generated Solutions, Inc. (2022), https://www.cgsinc.com/en/resources/interest-sustainability-surges-consumer-products.

[77] *Consumers willing to pay 9.7 percent sustainability premium, even as cost-of-living and inflationary concerns weigh: PwC 2024 Voice of the Consumer Survey*, PwC (May 15, 2024), https://www.pwc.com/gx/en/news-room/press-releases/2024/pwc-2024-voice-of-consumer-survey.html.

126.    A 2023 study from Bain & Company concluded that consumers are willing to pay at least 12% more for sustainable products.[78]

127.    A 2024 study from the National Association of Convenience Stores ("NACS") found that, when comparing two similar products priced at $10 or less, 71% of consumers would select the one that follows sustainable practices.[79]

128.    According to a 2021 study from GlobeScan, for the Forest Stewardship Council, "86 percent of consumers try to avoid products that damage biodiversity and about seven in ten want to choose products that do not contribute to climate change."[80]

129.    What's more, P&G *knows* that its consumers value environmentally friendly products, hence why it participated in the Forest Allies program and RA certification process.

## VI.    Defendants' Representations Mislead Reasonable Consumers.

130.    Reasonable consumers encountering Defendant P&G's representations emphasizing that the Products are sourced in accordance with the "sustainability promise" to "protect, grow, and restore" trees do not expect the Products to be the product of environmentally destructive clearcutting.

131.    Reasonable consumers would consider forest degradation practices, such as clearcutting to not be environmentally friendly.

---

[78] *Consumers Say Their Environmental Concerns are Increasing Due to Extreme Weather; Study Shows They're Willing to Change Behavior, Pay 12% More for Sustainable Products*, Bain & Company (Nov. 13, 2023), https://www.bain.com/about/media-center/press-releases/2023/consumers-say-her-environmental-concerns-are-increasing-due-to-extreme-weather-study-shows-theyre-willing-to-change-behavior-pay-12-more-for-sustainable-products/.

[79] *U.S. Consumers Willing to Pay More for Sustainable Products*, NACS (Apr. 24, 2024), https://www.convenience.org/Media/Daily/2024/April/24/4-US-Consumers-Pay-Sustainable_Products_Research.

[80] *2021 Global Consumer Research Reveals Escalating Concerns about Climate Change and Threats to Forest Biodiversity*, GlobeScan for the FSC, https://globescan.com/2021/10/21/consumer-research-reveals-escalating-concerns-about-climate-change-forest-biodiversity/ (last visited Mar. 13, 2025).

132. P&G misleads consumers by explicitly representing the Products as environmentally friendly, when they are the result of forest degradation of critical habitats.

133. Forest degradation is "the loss or reduction of a forest's ecosystem integrity through intensive logging and the targeting of older stands of trees within a forest by loggers."[81]

134. Forest degradation is also a "stepping-stone to deforestation,"[82] which is "the action or process of clearing of forests."[83]

135. P&G claims that it does not engage in deforestation. The P&G Forest Commodities Policy, however, relies on a very narrow definition of deforestation. It states:

> "P&G policies require our direct suppliers to commit to no deforestation, meaning: No loss of a natural forest for non-forest or agricultural use. Where applicable, the High Carbon Stock Approach Toolkit should be applied to identify and conserve High Carbon Stock (HCS) forests and High Conservation Value (HCV) areas. No conversion of a natural forest ecosystem to another land use, including plantations. No use of illegally sourced forest commodities or conflict timber. No new development of peatlands, regardless of depth. No burning to clear land for new development or replanting."[84]

136. In short, P&G's policy purports that as long as forest land is not converted to agricultural use and/or trees are replanted after clearcutting, it is not considered deforestation. This is not what a reasonable consumer understands "no deforestation" to mean.

---

[81] *See* DellaSala, et al., *supra* note 5. *see also* Jillian Mackenzie and Melissa Denchak, *Deforestation and Forest Degradation: The Causes, Effects, and Solutions*, NRDC (Nov. 25, 2024), https://www.nrdc.org/stories/deforestation-forest-degradation-causes-effects-solutions.

[82] Lorin Hancock, *What is forest degradation and why is it bad for people and wildlife?*, World Wildlife Fund, https://www.worldwildlife.org/stories/what-is-forest-degradation-and-why-is-it-bad-for-people-and-wildlife (last visited Mar. 13, 2025).

[83] *Deforestation*, Merriam-Webster, https://www.merriam-webster.com/dictionary/deforestation (last visited Mar. 13, 2025).

[84] *P&G's Forest Commodities Policy*, P&G (May 2023), https://s1.q4cdn.com/695946674/files/doc_downloads/esg/2021/Forestry/06/8958_P-G_WoodPulp_Policy_A-3.pdf In 2022, the NRDC filed a complaint with the Securities and Exchange Commission ("SEC") claiming that P&G's claims that the company prohibited forest degradation in its supply chains was materially misleading to investors. In response, P&G simply removed the statement regarding prohibition of forest degradation in its pulp supply chain from its Forest Commodities Policy.

137.    While deforestation occurs when forests are converted to non-forest uses, such as agriculture and road construction, forest degradation occurs when forest ecosystems lose their capacity to provide important services to people and nature.[85]

138.    P&G's supply chain for the Products has been credibly linked with forest degradation practices—namely, by sourcing extensively from forest units that contain boreal caribou habitat and lack FSC certification. Not only would reasonable consumers not consider these practices to be sustainable, but they would also not expect practices that are technically considered "forest degradation" in a supply chain that is advertised as fighting deforestation.

139.    Defendant RA is complicit in, and profits off, these misrepresentations.[86]

140.    Thus, Defendants' conduct in marketing the Products deceives consumers. Plaintiff and Class Members have been, and continue to be, deceived into believing that the Products are beneficial for the environment and sustainable when, in fact, the Products are sourced via the depletion of virgin forests, including the climate-critical Canadian Boreal Forest.

141.    P&G knows what representations it makes in marketing the Products. P&G also knows how the Products are sourced and produced. P&G, thus, knew, or should have known, the facts demonstrating that the Products are falsely represented to consumers.

---

[85] *See* DellaSala, et al., *supra* note 5; *see also Deforestation and Forest Degradation*, Int'l Union for Conservation of Nature (Feb. 2021). https://iucn.org/sites/default/files/2022-04/deforestation-forest_degradation_issues_brief_2021.pdf; Brendan Mackey, et al, *supra* note 6. This study found two major categories of forest degradation in the managed forest estate of Ontario and Quebec, which have accrued due to the cumulative ecological impacts of logging: (1) a loss of stand age diversity, particularly older forests, to the expanse of early-successional and young forest stands; and (2) the loss and degradation of critical caribou habitat and an increase in the risks to self-sustaining boreal caribou populations. The article further points out that the Canadian Government claims that its forests have been managed according to the principles of sustainable forest management for many years, yet this notion of sustainability is tied mainly to maximizing wood production and ensuring the regeneration of commercially desirable tree species following logging. The article discusses the industry's false claims that commercial logging of natural forests does not constitute either "deforestation" or "degradation," so long as the forest remains dominated by naturally regenerating, commercially valued tree species and the wood supply is sustained.

[86] As a founding member of the Forest Allies program, P&G was allowed to use an "altered but nearly identical seal" for three years at a cost of $250,000 per year. *See supra* ¶ 114.

142. In making the false, misleading, and deceptive representations and omissions at issue, P&G also knew and intended that consumers would choose to buy, and would pay more for, products represented to be "environmentally friendly" and sustainable, furthering its private interest of increasing sales of the Products and decreasing the sales of its competitors' products that are truthfully marketed.

143. The same allegations apply to RA as it promotes and profits from its partnership with P&G, which is based on misleading representations about the Products.

144. Plaintiff and Class Members have been financially harmed by the misrepresentations of these products.

## JURISDICTION AND VENUE

145. This Court has personal jurisdiction over the parties in this case. Plaintiff consents to this Court having personal jurisdiction over them.

146. Defendant P&G is incorporated in Delaware and headquartered in Ohio.

147. Defendant P&G regularly conducts and transacts business in New York, purposefully avails itself of the laws of New York, markets the Products to consumers in New York, and sells the Products throughout New York. Plaintiff purchased the Products in New York State.

148. Defendant RA is incorporated in New York.

149. Plaintiff Maggio is a citizen of New York and consents to this Court's jurisdiction.

150. This Court has original subject-matter jurisdiction over this proposed class action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), which provides for the original jurisdiction of the federal courts in any class action in which the proposed plaintiff class comprises at least 100 members, any member of the plaintiff class is a citizen of a state different from any

defendant, and the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs. Plaintiff alleges that the total claims of individual members of the proposed Class (as defined herein) exceed $5,000,000 in the aggregate, exclusive of interest and costs.

151.    Venue is proper in this District under 28 U.S.C. § 1391(a). Substantial acts in furtherance of the alleged improper conduct, including the dissemination of false and misleading information regarding the nature and quality of the Products, occurred within this District.

## CLASS ALLEGATIONS

152.    Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and all other similarly situated individuals (the "Class"), defined as follows:

> All consumers who purchased the Products in the United States during the applicable statute of limitations period (the "Class Period") and until the date of class certification.

153.    Excluded from the Class are (1) Defendants, any entity or division in which Defendants have a controlling interest, and Defendants' legal representatives, officers, directors, assigns, and successors; and (2) the judge to whom this case is assigned and the judge's staff.

154.    Included in the Class, to the extent necessary, is a subclass of all persons who purchased the Products (as defined herein) in New York during the Class Period (the "New York Subclass").

155.    Common questions of law and fact exist as to all Class Members and predominate over questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a)  Whether Defendants are responsible for the advertising at issue;

b)  Whether the advertising of the Products was unfair, false, deceptive, fraudulent, and/or unlawful;

c) Whether Defendants breached a warranty created through the marketing of its Product; and

d) Whether Defendants' conduct as set forth above injured Plaintiff and Class Members.

156. Plaintiff's claims are typical of the claims of the Class in that they were exposed to Defendants' false and misleading marketing and promotional materials and representations, purchased the Products, and suffered a loss as a result of those purchases.

157. The precise number of the Class Members and their identities are unknown to Plaintiff at this time but may be determined through discovery.

158. Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class Members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions involving false advertising, and she intends to prosecute this action vigorously.

159. The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class Members. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability. A class action provides a fair and efficient method, if not the only method, for adjudicating this controversy and avoids the potential for inconsistent or contradictory judgments. The substantive claims of Plaintiff and the Class are nearly identical and will require evidentiary proof of the same kind and application of the same laws. There is no plain, speedy, or adequate remedy other than by maintenance of this class action.

160. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because Class Members number in the thousands and individual joinder is impracticable. The expense and burden of individual litigation would make it

impracticable or impossible for proposed Class Members to prosecute their claims individually, and the disposition of this case as part of a single class action lawsuit will benefit the parties and greatly reduce the aggregate judicial resources that would be spent if this matter were handled as hundreds or thousands of separate lawsuits. Trial of Plaintiff's and the Class Members' claims together is manageable. Unless the Class is certified, Defendants will remain free to continue to engage in the wrongful conduct alleged herein without consequence.

161. No member of the Class has a substantial interest in individually controlling the prosecution of a separate action.

162. The prerequisites to maintaining a class action for equitable relief are met. By representing that the Products are environmentally friendly and by omitting the significant forest degradation that the production of the Products generates, Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final equitable and monetary relief with respect to the Class as a whole.

163. The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants. Additionally, individual actions could be dispositive of the interests of the Class even where certain Class Members are not parties to such actions.

164. Defendants' conduct is generally applicable to the Class as a whole, and Plaintiff seeks, *inter alia*, equitable remedies with respect to the Class as a whole.

165. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance of a class action.

## CAUSES OF ACTION

### COUNT I
### Violations of the New York General Business Law § 349
*Against All Defendants*
**(On Behalf of Plaintiff and the New York Subclass**)

166. Plaintiff realleges and incorporates herein by reference all preceding paragraphs of this Complaint as though set forth and at length herein.

167. The acts of Defendants, as described above, and each of them, constitute unlawful, deceptive, and fraudulent business acts and practices.

168. Defendants market the Products as sustainable which is false because Defendants engage in forest degradation practices to make the Products.

169. Defendants have violated, and continues to violate, § 349 of the New York General Business Law ("NYGBL"), which makes deceptive acts and practices unlawful. As a direct and proximate result of Defendants' violation of § 349, Plaintiff and other members of the Subclass have suffered damages in an amount to be determined at trial.

170. Defendants' improper consumer-oriented conduct is misleading in a material way in that it, *inter alia*, induced Plaintiff and Subclass Members to purchase and to pay the requested price for the Products when they otherwise would not have or would not have purchased as much.

171. Defendants made the untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

172. Plaintiff and Subclass Members have been injured by their purchase of the Products, which were worth less than what they paid for, and which they selected over other products that may have been truthfully marketed.

173. Defendants' advertising induced Plaintiff and Subclass Members to buy the Product, to buy more of them, and/or to pay the price requested.

174. As a direct and proximate result of Defendants' violation of § 349, Plaintiff and other members of the Subclass paid for the falsely advertised Products and, as such, have suffered damages in an amount to be determined at trial.

175. By reason of the foregoing, Plaintiff and Subclass Members are entitled to (1) actual damages and/or statutory damages; (2) punitive damages; and (3) reasonable attorneys' fees, pursuant to NYGBL § 349(h).

**COUNT II**
**Violations of the New York General Business Law § 350**
*Against All Defendants*
**(On Behalf of Plaintiff and the New York Subclass)**

176. Plaintiff realleges and incorporates herein by reference all preceding paragraphs of this Complaint as though set forth and at length herein.

177. The acts of Defendants, as described above, and each of them, constitute unlawful, deceptive, and fraudulent business acts and practices.

178. New York General Business Law § 350 provides: "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

179. NYGBL § 350-a defines "false advertising," in relevant part, as "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect."

180. Plaintiff and the members of the Subclass are consumers who purchased Defendants' Products in New York.

181. As a seller of goods to the consuming public, Defendants are engaged in the conduct of business, trade, or commerce within the intended ambit of § 350.

182. Defendants' representations (made by statement, word, design, device, sound, or any combination thereof), and also the extent to which Defendants' advertising has failed to reveal

material facts with respect to its Products, as described above, have constituted false advertising in violation of § 350.

183. Defendants' false advertising was knowing and intentional, as Defendants are aware that the Products' wood pulp is sourced from climate critical FMAs with declining caribou populations.

184. Defendants' actions led to direct, foreseeable, and proximate injury to Plaintiff and the members of the Subclass.

185. As a consequence of Defendants' deceptive marketing scheme, Plaintiff and the other members of the Subclass suffered an ascertainable loss, insofar as they would not have purchased the Products had the truth been known, would not have paid the requested price for the Products and/or would have purchased less of the Products; moreover, as a result of Defendants' conduct, Plaintiff and the other members of the Subclass received products of less value than what they paid for.

186. By reason of the foregoing, Plaintiff and Subclass Members are entitled to (1) actual damages and/or statutory damages; (2) punitive damages; and (3) reasonable attorneys' fees, pursuant to NYGBL § 350-e (3).

## COUNT III
### Violation of State Consumer Protection Statutes
#### *Against All Defendants*
#### (on Behalf of Plaintiff and All Class Members)

187. Plaintiff realleges and incorporates herein by reference all preceding paragraphs of this Complaint as though set forth and at length herein.

188. Defendants' unfair, false, misleading, and fraudulent practices in marketing the Products, as alleged herein, violate each of the following state consumer protection statutes to the extent that Products have been marketed in, and purchased by Class members in, the respective

states: Ala. Code § 8-19-5(27); Alaska Stat. § 45.50.471(a); Ariz. Rev. Stat. § 44-1522; Ark. Code § 4-88-107(a), (a)(10); Cal. Civ. Code § 1750, Cal. Bus. & Prof. Code §§ 17200, 17500, 17580.5; Colo. Rev. Stat. §§ 6-1-105 (e), (g); Conn. Gen. Stat.§ 42-110b(a); Del. Code Ann. tit. 6, § 2513(a); Fla. Stat. Ann. § 501.204; Ga. Code § 10-1-393(a); Haw. Rev. Stat. § 480-2(a), (d); Idaho Code § 48-603(17); 815 Ill. Comp. Stat. Ann. § 505/2; Ind. Code § 24-5-0.5-3(a); Iowa Code § 714H.3(1); Kan. Stat. § 50-626(a); Ky. Rev. Stat. § 367.170; La. Rev. Stat. Ann. § 51:1405(A); Me. Rev. Stat. Ann. tit. 5 § 207; Md. Code Comm. Law § 13-301(1), (3); § 13-303; Mass. Gen. Laws Ch. 93A, § 2(a); Mich. Comp. Laws Ann. § 445.903(1)(s), (bb), (cc); Minn. Stat. § 325F.69(1); Miss. Code § 75-24-5(2)(e),(g); Mo. Rev. Stat. § 407.020(1); Mont. Code § 30-14-103; Neb. Rev. Stat. § 59-1602; Nev. Rev. Stat. § 598.0915(15); N.H. Rev. Stat. § 358-A:2; N.J. Stat. Ann. § 56:8-2; N.M. Stat. Ann. §§ 57-12-2(D), 57-12-3; N.Y. Gen. Bus. Law §§ 349, 350; N.C. Gen. Stat. § 75-1.1(a); N.D. Century Code §§ 51-15-02, 51-15-02.3; Ohio Rev. Code § 1345.02; Okla. Stat. Ann. tit. 15, §§ 753, 752(13); Or. Rev. Stat. § 646.608(1); 73 Pa. Stat. § 201-2(4); R.I. Gen. Laws §§ 6-13.1-1(6)(xii), (xiii), (xiv), 6-13.1-2; S.C. Code § 39-5-20(a); S.D. Codified Laws § 37-24-6(1); Tenn. Code § 47-18-104(a); Tex. Bus. & Com. Code § 17.46(b)(2), (3), (5), (7), (24); Utah Code Ann. § 13-11-4(1); Vt. Stat. Ann. tit. 9, § 2453(a); Va. Code Ann. § 59.1-200(A)(14); Wash. Rev. Code § 19.86.020; W. Va. Code §§ 46A-6-102(7); Wis. Stat. Ann. § 100.18(1); Wyo. Stat. Ann. § 40-12-105(a)(xv).

189.    Defendants made the misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

190.    Plaintiff and all Class members have been injured by their purchases of the Products.

191.    As a direct and proximate result of Defendants' violation of consumer protection law, Plaintiff and all other Class members have suffered damages in an amount to be determined at trial.

192.    On March 28, 2025, pre-suit letters were sent to Defendants via U.S. mail and electronic mail that provided notice of Defendants' violations of state consumer protection statutes and demanded that Defendants correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and/or deceptive practices complained of herein. The letter also stated that if Defendants refused to do so, a complaint seeking damages would be filed.

193.    Accordingly, Plaintiff, on behalf of herself and all other members of the Class, seek compensatory damages, punitive damages, and restitution of any ill-gotten gains due to Defendants' acts and practices, according to the availability of relief under the applicable statutes.

**COUNT IV**
**Breach of Express Warranty**
*Against All Defendants*
**(on Behalf of Plaintiff and All Class Members)**

194.    Plaintiff realleges and incorporates by reference all paragraphs alleged above.

195.    Plaintiff brings this claim individually and on behalf of all Class Members.

196.    Defendants provided Plaintiff and other members of the Class with written, express warranties that the Products conformed with the sustainability representations, which are easily accessible to any consumer. *See supra* §§ I, III.

197.    These affirmations of fact or promise by Defendants related to the goods and became part of the basis of the bargain.

198.    Plaintiff and members of the Class purchased the Products believing them to conform to the express warranties.

199. Defendants breached these warranties, resulting in damages to Plaintiff and other members of the Class, who bought the Products but did not receive the goods as warranted.

200. As a proximate result of the breach of warranties by Defendants, Plaintiff and the other members of the Class did not receive the goods as warranted. Moreover, had Plaintiff and the Class members known the true facts, they would not have purchased the Products, or would have purchased the Products on different terms, or would have purchased fewer of the Products.

201. Notice of these breaches of warranty was provided to Defendants on March 28, 2025, as described *supra*, which is incorporated here by reference as if fully set forth herein.

202. Plaintiff and the members of the Class, therefore, have been injured and have suffered damages in an amount to be proven at trial.

<u>**COUNT V**</u>
**Breach of Implied Warranty**
***Against All Defendants***
**(on Behalf of Plaintiff and All Class Members)**

203. Plaintiff realleges and incorporates herein by reference all preceding paragraphs of this Complaint as though set forth and at length herein.

204. Plaintiff brings this claim individually and on behalf of the Members of the proposed Class against Defendants.

205. The Class and New York Subclass will proceed under New York law, while all other state Subclasses will proceed, in the alternative, according to the state law where the purchases were made.

206. Defendants routinely engage in the manufacture, distribution, and/or sale of the Products and are merchants that deal in such goods or otherwise hold themselves out as having knowledge or skill particular to the practices and goods involved.

207.    Plaintiff and Members of the Class and Subclasses were consumers who purchased Defendants' Products for the ordinary purpose of such products. In the alternative, Defendants marketed the Products, and Plaintiff and Members of the Class and Subclasses purchased the Products, for the specific purpose of receiving sustainably made Products that conformed to the environmental representations, but received far less.

208.    By representing that the Products would conform to the sustainability representations, Defendants impliedly warranted to consumers that the Products were merchantable, such that they were of the same average grade, quality, and value as similar goods sold under similar circumstances.

209.    The Products, however, were not of the same average grade, quality, and value as similar goods sold under similar circumstances due to the forest degradation in the Products' supply chain. Thus, they were not merchantable and, as such, would not pass without objection in the trade or industry under the Product description.

210.    As a direct and proximate result of Defendants' breach, Plaintiff and Members of the Class and Subclasses were injured because they paid money for the Products that would not pass without objection in the trade or industry under the contract description.

### COUNT VI
### Unjust Enrichment
### *Against All Defendants*
### (on Behalf of Plaintiff and All Class Members)

211.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

212.    Plaintiff brings this claim individually and on behalf of the Class.

213.    To the extent required by law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

214.    Plaintiff and the members of the Class conferred benefits on Defendants by purchasing the Products.

215.    Defendants were unjustly enriched by receipt of these revenues derived from the purchases of Plaintiff and the members of the Class.

216.    Retention of those monies under these circumstances is unjust and inequitable because Defendants misrepresented the Products as environmentally friendly when the Products' supply chain contributes to forest degradation and other negative environmental consequences.

217.    Retention of those monies under these circumstances is unjust and inequitable because Defendants misrepresented the Products as RA certified when they are not.

218.    Plaintiff and members of the Class were damaged by Defendants' misrepresentations because they would not have purchased the Products if the true facts were known.

219.    Because Defendants' retention of the non-gratuitous benefits conferred on it by Plaintiff and the members of the Class is unjust and violates the fundamental principles of justice, equity, and good conscience, Defendants have been unjustly enriched in an amount to be determined at trial.

220.    Plaintiff and the members of the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enters judgment in her favor and in favor of the Class as follows:

A.    An order certifying the proposed Class; appointing Plaintiff as representative of the Class and New York Subclass; and appointing Plaintiff's undersigned counsel as class counsel for the Class and all Subclasses;

B.     An order declaring that Defendants are financially responsible for notifying Class Members of the pendency of this suit;

C.     An order declaring that Defendants' conduct violate the statutes referenced herein;

D.     An order awarding monetary damages, including actual damages, statutory damages, and punitive damages, in the maximum amount provided by law under the statutes named herein;

E.     An order awarding compensation for breach of warranty;

F.     An order for prejudgment interest on all amounts awarded;

G.     An order awarding Plaintiff and the other Class Members the reasonable costs and expenses of suit, including attorneys' fees; and

H.     Any further relief that the Court may deem appropriate.

<b><u>JURY TRIAL DEMANDED</u></b>

221.     Plaintiff hereby demand a trial by jury.

DATED: March 31, 2025                            **RICHMAN LAW & POLICY**

_____
Kim E. Richman
1 Bridge Street, Suite 83
Irvington, NY 10533
T: (914) 693-2018
krichman@richmanlawpolicy.com
*Counsel for Plaintiff and the Class*